UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUBEN JAMES PUGA,

        Petitioner,

vs.

JOE McGRATH, Warden,

        Respondent.

        /

No. C 04-5339 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

## BACKGROUND

A jury convicted petitioner of escape from prison. With enhancements for prior offenses, the trial court sentenced him to prison for twenty-five years to life. As grounds for habeas relief, petitioner asserts that: (1) his due process rights were violated when the trial court denied his motion for change of venue; (2) imposition of an enhancement for prior convictions violated his double jeopardy rights; and (3) his life sentence for non-forcible escape was cruel and unusual punishment.

Petitioner does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

    On April 30, 2001, Puga disappeared from Pelican Bay State Prison, where he was an inmate. On May 3, a homeowner named Donald Allen found that his Honda Civic was missing from his garage. A day or so later, he and

his wife saw that an intruder had been in their motor home, which was parked next to the garage. There were muddy clothes in the motor home. There were also an empty beer can and an empty water bottle, which had been taken from a refrigerator in the garage.
Puga's fingerprints were found on the beer can and the water bottle. On May 23, 2001, Puga was arrested in Sacramento. He gave the arresting officers another man's driver's license as identification. In late June 2001, the Allens' Honda was found parked on a street in San Francisco. No fingerprints from the car or its contents could be identified as Puga's. However, Puga's former girlfriend told investigators that Puga had said he abandoned a car in San Francisco after it ran out of gas.

Ex. C at 1-2.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

1 established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must
2 be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

3 Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual
4 determination will not be overturned on factual grounds unless objectively unreasonable in
5 light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at
6 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

7 When there is no reasoned opinion from the highest state court to consider the
8 petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,
9 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th
10 Cir.2000).

**DISCUSSION**

**I.   Change of Venue**

13 Petitioner claims that his due process rights were violated when the trial court denied
14 his motion for change of venue.  A criminal defendant facing trial by jury is entitled to be
15 tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).
16 Accordingly, a trial judge must grant a motion for change of venue if prejudicial pretrial
17 publicity makes it impossible to seat an impartial jury. *Gallego v. McDaniel*, 124 F.3d 1065,
18 1070 (9th Cir. 1997).  A defendant must demonstrate one of two different types of prejudice
19 in support of a motion for change of venue: presumed or actual.  *Id.*  This distinction is
20 clearly established Federal law as determined by the Supreme Court under the AEDPA
21 standard of review. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999) (citing *Murphy v.
22 Florida*, 421 U.S. 794, 798 (1975), and *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)),
23 *overruled on other grounds as stated in Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir.
24 2000).

25 The duty of a federal court sitting in habeas corpus is to "make an independent
26 review of the record to determine whether there was such a degree of prejudice against the
27 petitioner that a fair trial was impossible." *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir.
28 1984) (citing *Irvin*, 366 U.S. at 723).  At the same time, it must presume correct any factual

3

1 determinations made by the state courts unless the petitioner rebuts the presumption of
2 correctness by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and may not grant
3 the writ unless it concludes that the state court decision "was based on an unreasonable
4 determination of the facts in light of the evidence presented in the State court proceeding."
5 28 U.S.C. § 2254(d).  Here, the court is unable to make an independent review of the
6 pre-trial publicity itself because the media coverage was not included in the record.  Thus,
7 the court relies on the voir dire transcript and the state courts' findings of fact regarding the
8 nature and extent of the pre-trial publicity.  *See Daniels v. Woodford*, 428 F.3d 1181,
9 1210-1211 (9th Cir. 2005).

       A.    <u>Presumed Prejudice</u>

"Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Gallego*, 124 F.3d at 1070 (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996) (as amended)).  The publicity must be "so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial." *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997)).  Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. *Gallego*, 124 F.3d at 1070; *Croft*, 124 F.3d at 1115.  Among the factors to be considered are: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge [] wave of public passion;" (2) "whether the media accounts were primarily factual"; and (3) "whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998) (citations omitted), *amended by* 152 F.3d 1223 (9th Cir. 1998). *Compare Daniels*, 428 F.3d at 1210-12 (denial of motion for change of venue violated defendant's due process rights where publicity both in the wake of the crime and immediately before trial was inflammatory rather than merely factual in nature and where the public's response amounted to a "huge" waive of public passion), *with Randolph v. California*, 380 F.3d 1133, 1142-43 (9th Cir. 2004) (denial of venue change did not violate defendant's constitutional rights because the six- to eight-year

4

1 gap between the publicity and the actual trial mitigated any bias created by the publicity
2 and majority of published articles were factual in nature, even though the media did
3 disclose some prejudicial and inadmissible material).

4      The three factors indicating presumed prejudice are not satisfied in the present case.
5 First, the publicity did not amount to a "barrage of inflammatory publicity immediately prior
6 to trial." *See Ainsworth*, 138 F.3d at 795.  Unlike in *Daniels*, where the publicity resumed
7 as the trial approached, here all of the publicity occurred eight months before trial.  *Daniels*,
8 428 F.3d at 1211; RT 47, 443-44, 457-58.[1]  It consisted of just four newspaper articles from
9 the "one principal paper," the *Daily Triplicate*, a wanted poster posted at the post office, and
10 some television and radio broadcasts to which the trial judge sustained an objection due to
11 the uncertainty of listener and viewership.  RT 442-47, 457-60.  Second, the media
12 accounts were "primarily factual."  *See Ainsworth*, 138 F.3d at 795.  Unlike in *Daniels*,
13 where the press accounts included editorials and letters to the editor calling for Daniels's
14 execution, here the trial court noted the absence of "editorial comment" and concluded that
15 the paper coverage was "not disproportionate to the event."  *Daniels*, 428 F.3d at 1212; RT
16 447, 459-60.  Finally, the media accounts did not contain "inflammatory, prejudicial
17 information that was not admissible at trial."  *See Ainsworth*, 138 F.3d at 795.  In *Daniels*,
18 the news articles described Daniels's past criminal offenses, which included an arrest for
19 shooting at a police officer, and reflected the prosecution's theory of the case by attributing
20 the killings to Daniels's desire to escape justice.  *Daniels*, 428 F.3d at 1212.  By contrast,
21 the publicity here depicted petitioner as a nonviolent criminal, highlighting that he had
22 simply "walked away" from the prison, that he had been a low security inmate because he
23 had not used weapons during the robberies that led to his imprisonment, and that he did
24 not attempt violence when the police finally apprehended him.  RT 457-58.  Neither the
25 newspaper articles nor the posters mentioned that petitioner was a three-strikes criminal.
26 RT 451, 458.  In addition, although the majority of potential and actual jurors recalled

---

[1] "RT" refers to the Reporter's Transcript.

5

reading an article and/or hearing a report on the radio about the escape, most had only a vague recollection of the details which "did not seem to reflect that it was an inflammatory sort of thing." RT 443.

The trial court denied the motion for change of venue, finding that "it[ was] not even a close call." RT 460-61. The state court of appeal affirmed. Because the record indicates that the community where petitioner's trial was held was not "saturated" with prejudicial and inflammatory publicity about the crime, the state courts' conclusion was neither contrary to nor an unreasonable application of Supreme Court authority. *See Gallego*, 124 F.3d at 1070.

B.   Actual prejudice

To establish actual prejudice, petitioner must demonstrate "that the jurors exhibited actual partiality or hostility that could not be laid aside." *Gallego*, 124 F.3d at 1070 (quoting *Sherwood*, 98 F.3d at 410). The focus must be on the jurors who were actually seated on the petit jury. *Id.* at 1071. It is not enough that some of them had some prior knowledge of the case. *Id. See, e.g., Casey v. Moore*, 386 F.3d 896, 909-10 (9th Cir. 2004) (finding no actual prejudice where not one seated juror had said that he or she had definitely formed opinions about the case, none harbored hostility toward defendant that could not be set aside, no prospective juror with any connection to the case was seated, and the trial court allowed the defense unrestricted opportunities to question jurors in voir dire).

The record in this case does not support a finding that the jury as finally constituted was actually prejudiced. Here is a breakdown of the voir dire responses of the seated jurors: Juror 68738 (#1) originally stated that he "might edge in [the] direction" of giving more credit to a correctional officer than a inmate, but he unequivocally accepted the proposition that "[he] might hear an officer's testimony and disbelieve it based on other evidence [he] might hear." RT 259-60. Juror 67310 (#2) could not remember any publicity about the case. RT 414. She had been divorced thirty years from her husband who was a correctional officer and had no other involvement with law enforcement. RT 414. She agreed that she "could definitely have a fair opinion" of the case and that she would hear all

the evidence. RT 415. Juror 68312 (#3) had not heard about the incident because she was out of the area when the incident occurred. RT 406. She stated that she did not feel any bias against petitioner and that she would not give more weight to a correctional officer's testimony. RT 406-07. Juror 66822 (#4) heard about the incident by word of mouth but had not discussed it or formed an opinion on it. RT 409-11. She attended the same church as three correctional officers, but her relationship with them did not extend beyond church, and she stated that she did not believe she would give more weight to a correctional officer's testimony. RT 409-11. Juror 64451 (#5) stated that he or she could not remember the publicity surrounding the escape and was not acquainted with any of the people involved in the case. RT 61, 73. Juror 68619 (#6) rented her family farm to the Allens; however, she and the Allens were "not close to the extent they visit socially or go about common social endeavors," and she assured the court that she "hope[d she] would be as objective as anyone else on this panel." RT 476.

     Juror 73128 (#7) worked with law enforcement officers at the state park, but she did not find them to be particularly trustworthy. RT 197-98, 200. Although she was friends with an individual on the search team and had read about and discussed the incident with her boyfriend, she stated that she had no opinion about the case and would have no problem weighing the evidence fairly. RT 201. Juror 63102 (#8) knew people who worked at the prison, and hearing about the escape had given him some concern; however, he assured the court that "[he] wouldn't give favor toward anyone" and would "start out with a clean slate." RT 143-47. Juror 74868 (#9) had a tenant who was employed by Pelican Bay but stated that he or she would have no problem being "fair and impartial in weighing the defenses [sic] testimony [even though] he's on the other side of the fence than a correctional officer." RT 95. Juror 74782 (#10) did not have an opinion about the case because he or she only knew "what [he or she] heard on the radio" and believed that media sources could "probably not" be accurate. RT 323-24. Juror 71250 (#11) had heard nothing about the case in the media. RT 467. She had a step-brother who was a correctional officer, but she had not talked to him in two years and stated that she would

not give more credence to law enforcement witnesses. RT 467. Lastly, Juror 62700 (#12) had read about the escape in the newspaper but had forgotten about it until she was summoned as a juror. RT 331. Although she initially stated that she would "probably tend to believe a correctional officer" over an inmate, she unequivocally agreed with the court's assessment that she was willing "to make a conscientious effort to weigh and evaluate the evidence and follow the court's instructions." RT 334.

This record indicates that none of the seated jurors exhibited "actual partiality or hostility that could not be laid aside." *See Gallego*, 124 F.3d at 1070. To summarize, four jurors had no memory of the publicity surrounding the escape. Those who did remember the publicity did not recall details or indicate that they had formed an opinion about the case. All jurors who had any connection to correctional officers at Pelican Bay assured the court that they could be fair and impartial. In addition, the trial judge gave defense counsel unrestricted opportunities to question jurors individually in voir dire.

Even if the record did give some indication of bias, however, the results of the trial alone indicate that petitioner's jury was impartial. As the state court of appeal noted, the jury acquitted petitioner of automobile theft and deadlocked on the burglary charge, despite the ample circumstantial evidence supporting these charges. The only charge for which the jury returned a guilty verdict was the escape charge. Given the clear evidence of petitioner's previous conviction of two felony counts of robbery, his confinement at Pelican Bay, his absence from prison before his sentence was up, and his arrest in Sacramento, it is hard to imagine how any impartial jury could have come to a different verdict.

For these reasons, the state courts' finding that there was no presumed or actual prejudice was neither contrary to nor an unreasonable application of Supreme Court authority.

**II.     Double Jeopardy**

Petitioner claims that the imposition of an enhancement for prior convictions violated his double jeopardy rights. The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy

8

of life or limb." U.S. Const. amend. V.  The Supreme Court in *Benton v. Maryland*, 395 U.S. 784, 794 (1969) held that the Clause's protections were applicable to the states through the Fourteenth Amendment.

The guarantee against double jeopardy protects against (1) a second prosecution for the same offense after acquittal or conviction, and (2) multiple punishments for the same offense. *Witte v. United States*, 515 U.S. 389, 395-96 (1995).  It is well-settled that an enhancement of the punishment imposed for a later offense "'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes,' but instead as 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.'"  *Witte*, 515 U.S. at 400 (quoting *Gryger v. Burke*, 334 U.S. 728, 732 (1948)); *accord United States v. Kaluna*, 192 F.3d 1188, 1198-99 (9th Cir. 1999).

In this case, petitioner is not being punished for his previous robberies, but rather for the latest crime of escape as an aggravated offense.  Therefore, there is no violation of the Double Jeopardy Clause.  Accordingly, the decision of the state court of appeal to that effect was neither contrary to, nor an unreasonable application of, clearly established Supreme Court authority.

### III.    Cruel and Unusual Punishment

Petitioner claims that his life sentence for non-forcible escape was cruel and unusual punishment.  The Eighth Amendment to the United States Constitution provides that there "shall not be . . . cruel and unusual punishment inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) ("A gross disproportionality principle is applicable to sentences for terms of years.").  The Eighth Amendment does not preclude a state from making a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime, as may occur under a recidivist sentencing statute.

*Ewing*, 538 U.S. at 25, 29-30.  In determining whether a sentence is grossly disproportionate under a such a statute, the court looks to whether the "extreme sentence is justified by the gravity of [the individual's] most recent offense and criminal history." *Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).

In *Andrade*, the Supreme Court upheld a Three Strikes sentence of two consecutive twenty-five-to-life terms for a recidivist convicted of stealing approximately $150 worth of videotapes.  *Andrade*, 538 U.S. at 66, 77.  Andrade had a criminal history of petty theft, burglary, and transportation of marijuana.  *Id.* at 66.  Similarly, in *Ewing*, the Court upheld a Three Strikes sentence of twenty-five years to life for a repeat felon convicted of felony grand theft of three golf clubs worth nearly $1,200.  *Ewing*, 538 U.S. at 18-19, 30-31.  Ewing had a criminal history of theft, battery, burglary, possession of drug paraphernalia, illegal firearm possession, robbery, and trespass.  *Id.* at 18-19.  By contrast, the Ninth Circuit in *Ramirez* held that a Three Strikes sentence of twenty-five years to life on petty theft with prior conviction was grossly disproportionate to the crime.  *Ramirez*, 365 F.3d at 767.  Ramirez's prior criminal history consisted of two convictions for second-degree robbery obtained through a single guilty plea, for which his total sentence was one year in county jail and three years of probation.  *Id.* at 768.  The robberies were "nonviolent" shoplifting crimes in which the "force" used was when a third party drove the getaway car over the foot of a grocery store security guard and when Ramirez pushed a K-mart security guard out of his way as he fled the store.  *Id.*

Here, petitioner was convicted of escape from prison, a crime arguably more serious than the thefts in *Andrade* and *Ewing*.  In determining whether a sentence is grossly disproportionate under a recidivist sentencing statute, however, courts look not only at the most recent offense, but also at the petitioner's criminal history.  *Ramirez*, 365 F.3d at 768.  Unlike in *Ramirez*, where Ramirez's two prior strikes were nonviolent shoplifting crimes, petitioner's two prior strikes were robberies that "involved an attack on two victims, one of whom petitioner hit with a baseball bat and the other of whom he tied up with tape." *Ramirez*, 365 F.3d at 768; Ex. C at 5.  In addition, petitioner was on parole from a California

Youth Authority commitment for assault with great bodily injury when he committed the robberies. Ex. C at 5. Although this criminal history is not as long as the criminal histories of petitioners in *Ewing* and *Andrade*, a likely reason for this is petitioner's relative youth–he was only twenty-three years old at the time of his escape. *Id.*

Another factor weighing against petitioner is that a week before he committed the present offense, a counselor warned him of the third-strike consequences of another crime. *Id.* at 5. Petitioner had approached the counselor to request a transfer to a more secure unit so he would not be tempted to escape. *Id.* at 6. That neither petitioner's CYA commitment, his prison commitment, nor the counselor's warning deterred him from committing the third offense supports the state appellate court's conclusion that petitioner is "an especially persistent [recidivist]." On this record, the state court's rejection of petitioner's Eighth Amendment claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court authority.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 19, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.04\PUGA5339.RUL.wpd